Again, I am Corinne Chandler and I represent the appellant, Deborah Letvinuck, in this case. At trial in this case, we presented overwhelming evidence of conflict of interest on the part of Aetna. Both a conflict of interest that was apparent in the record and in evidence submitted outside of the record. The trial court rejected the evidence that we submitted outside of the record and it improperly held that there was no evidence of conflict of interest that tainted the claim decision. Can I say, before, I know I might interrupt in your flow, but there's a fact that maybe isn't even of any interest here and it's like, why didn't something happen? The thing that seems to brood over this case is a lot of the decision of the company seems to have hinged on that real and extensive neurological report that was done, which said that even though she felt that this particular form of MS affected her cognition, her cognition was great, to put it simply. Her cognition was really good. There just wasn't any real problem. Now, you've said, I think, in your briefs and I've seen the argument, well, but that happened a year or so before and we all know that MS can be progressive. It can be horribly progressive or it may not progress. One can't, we just don't know. It depends on the kind of MS and it may not affect cognition even at all. My question, which is why didn't, it was perfectly obvious that they were hinging a lot on that. Why wasn't another neurological done and submitted? I don't mean this one little thing like count backwards by sevens. Some of us are challenged to do that even when we were engineers. It's just a challenge. I don't mean that. Why didn't they just send it back to this other person and say, give us an updated neurological? Wouldn't that answer them or not answer them? That's my question. And maybe that just is not in the record and is inevitable. What is in the record is that in April 2005 when she did have a decline and when she presented to Dr. Weiner for, at that point when he said she has a marked degree of fatigue, more and more fatigue, he was considering, in the office note, he stated that he was considering doing repeat neuropsych testing. It wasn't done at that time. However, it must also be remembered that Dr. Weiner is in the business of treating his patient. He's not in the business of assessing, quote, functionality. And if Aetna had a question about whether there was a cognitive decline, it should have ordered testing. Well, Aetna said, listen, they didn't say they had a question. They said, we've got the neurological. She's fine. And you keep saying, oh, no, no, no, but you have to understand that she was declining all this time. She had declined. And that is what Dr. Weiner said. He said that she had declined. But he said she declined because she says, I'm not cognizing well. And he says, and I did a serial seven or whatever that thing is he did. That's it. So he didn't say, I did one before and I did one now and I know she's gotten worse. He just said, I just did one. And a person as smart as she is with her background should be able to, I think it was serial sevens, should be able to do serial sevens better than she did. That's what he said. That's it. That's what he said. And he also said that it would be unexpected with someone with her business mathematics background. Right. And the issue is, Aetna, if it had a question about it, what Aetna did in this case, instead of asking the question of Dr. Weiner, what it did is it made unwarranted assumptions. It said that Dr. Weiner's opinion was based exclusively on her desire and request for disability benefits. And we believe that that should have warranted a further investigation, or should have warranted a further deference in the review because it indicates that Aetna did not investigate the claim. They also, and we presented this trial, or this argument at trial, we argued that instead of making this erroneous assumption, Dr. Burton should have picked up the phone and asked Dr. Weiner, why are you making this assessment? The trial court held that Aetna was justifying on relying on the outdated testing because Aetna requested clinically objective findings supporting plaintiff's claim of disability, and Dr. Weiner failed to provide objective evidence of cognitive disability. That was the trial court's finding, and it was wrong on both counts. Why is it wrong? Where is the objective evidence of her cognitive disability? In light of the, in light of the, she was always saying I've got cognitive problems. She was saying it before the first exam. She just was always saying that. I've lost my ability, my cognitive ability. First exam showed that was not so. She keeps on saying it. The first exam actually, Your Honor, the first exam showed average results, intellectual results, and her job was highly demanding. There was no effort by that neuropsych to correlate whether somebody with those results could perform her job. Didn't her doctor say that? That was really an exceptional supplement. Her doctor said, not the one who did the testing, but her other doctor remarked that she did well and that there was no signs of dementia. Now, if that's going to be the sign for doing well, then, you know. But to get back to my point that the trial court's finding on that was erroneous. First of all, Aetna did not request clinically objective findings supporting disability. The record reference relied upon by the court and which has been relied upon by Aetna at trial in this case was a voicemail message. In October 2005, the voicemail message to Dr. Weiner's office, which supposedly requested clinically objective findings supporting disability, said, requested clinically objective findings demonstrating an ongoing process, looking for evidence of further decline. And contrary to the trial court's finding, Dr. Weiner did supply it. He sent his records in twice. They showed his serial 7 testing. They showed a decline in the condition. He showed that he wanted to repeat the neuropsych testing and that he observed cognitive dysfunction. Aetna also failed to investigate in failing to ascertain plaintiff's true job requirements. Even in this proceeding, we are quibbling over what were her job requirements. And this was a big issue in the case during the claim. Aetna contends that she only has a desk job in putting data. She stated in her appeal letter that her work supported the space shuttle mission, that she was responsible for making corrective recommendations to management at Boeing, and that affected million-dollar contracts. None of her medical reviewers had her job description. Now, the Supreme Court was faced with a similar situation in MetLife v. Glenn. In that case, the medical reviewers were not given the full medical records. The Glenn court found that this was a matter of serious concern that justified a reduction in deference. And finally, Aetna failed to investigate her claims of fatigue. Aetna's own claim guidelines recognize that cognitive dysfunction and fatigue are experienced by the vast majority of MS patients. Dr. Burton acknowledged that Dr. Weiner certified her disability in part on fatigue. The Aetna nurse acknowledged that fatigue could be disabling, yet none of the Aetna reviewers ever discussed whether her fatigue could be disabling. The trial court should also have decreased deference because at Aetna. Let me ask you, you've identified three or four matters so far. Yes, I have. That I gather you're going to get to the point where you're going to argue that the district court's deference. You seem to be aware of a body. Yes. In fact, you even used the term tempered deference. So you seem to be on top of what was the current state of the law. What level of deference do you contend you should have applied? I contended at the trial court, and I contend here, that the degree of conflict that was demonstrated should have required the court to employ a heavy skepticism review. Heavy skepticism. Unfortunately, well, that is the language that is utilized by the abatement, in that the deference given to the claim administrator's decision should be commensurate with the degree of conflict demonstrated. Yes. You keep using the term conflict, but it sounds more like, as I read your brief and as I hear you today, it's more like what you allege is that their investigation or assessment of her claim, both before the appeal and after the appeal, was deficient, more of a procedural. And I realize, I guess procedural deficiencies could be the basis for a conflict, but it doesn't strike me as a real. It's under the old bright line test. I think the analysis was, the case law discussing it, is did the administrator's financial conflict of interest, did it affect the claim decision? Does it show evidence of bias? And that is what happened here. There was a failure to investigate to ascertain meaningful information that would have supported the claim. So an inadequate investigation. That's right. That's right. That is, under abatement, that is evidence of conflict. And under SAFON. Well, that's evidence that would warrant a more searching review. Absolutely. And under SAFON v. Wells Fargo and Boonton v. Lockheed and even MetLife v. Glenn, we have an insurer who is held to higher than marketplace standards. It is just not an insurance company. It is an ERISA fiduciary. If there is information out there which supports the claim decision, it must ask for it. And in one of our ‑‑ I'll go on. Okay. You were going to go on to another shortcoming, I believe. I'd also like to briefly touch upon the court's standard for temperative use of discretion review. The court stated ‑‑ the court acknowledged that there was evidence on both sides of the coin here. However, it stated that it must uphold the claim decision because it was grounded on any reasonable basis. That ‑‑ we submit that that standard has been changed with the abatement decision. The abatement decision noted that under the prior bright line test, a claim decision would be upheld if it was grounded on any reasonable basis. But the abatement court said, going forward, that will no longer be the case. Going forward, plaintiffs will no longer have that burden. And the problem is that you have all these cases that were decided under the strict abuse of discretion review before abatement that used language like that, and now it is being used as the proper standard of review for temperative use of discretion. I see. I reserve the balance of my time. Okay. Thank you. Good morning, Your Honors. Lisa Gardner on behalf of Defendants Aetna and the Boeing Employee Health and Welfare Plan. Plaintiff is trying ‑‑ what is really ‑‑ what plaintiff is really arguing here is that there is a disagreement over what the appellant thinks should the level of discretion that the district court should have been applied to this versus what level of skepticism that the district court actually did apply. Every single argument that has been made before this court was made before the district court, and the district court considered each one of them and found that they were unavailing and unconvincing. Here is the core problem, though, or it is a problem. The district court did nod to a body, but the district court makes it quite clear that it thinks its standard of review is exactly the standard that a body tossed out. How in the world do we uphold that decision as opposed to telling the district court, listen, look at this thing afresh? Your Honor, I don't believe ‑‑ the district court did more than just give a nod to a body. The district court discussed it. District court says a decision on any reasonable basis is not arbitrary and capricious. It said that at the beginning of the decision on page 18, I guess. Yes, Your Honor. And it says it again at the end. A decision grounded on any reasonable basis is not arbitrary and capricious, and we uphold it. I don't see how it can do that in light of what a body said. I don't ‑‑ I mean, it's making a direct quote. Actually, I think it even quoted Jordan, maybe. I forget if it quoted Jordan. It may have. And a body just said, that ain't the rule anymore. Your Honor, the court did apply a temper deference, which is the rule. The court discussed each of the arguments. The court said, to the argument of lack of investigation, the court discussed that. The court discussed each one of these arguments about the job description. Well, they had the physical demand analysis. They had the resume of the plaintiff. They had the plaintiff's detailed letter describing her job. With respect to every issue, the court did, in fact, consider each, weighed it, and made a determination based on it. The court said that even applying a tempered deference to Aetna's decision due to conflict of interest, the court finds the determination was not an abuse of discretion.   And the court said that, in fact, it was not an abuse of discretion. So which page was that? Page 33 of the record. Is that what you're relying on? To put it in trial court language, there's a structural conflict here. Yes. The district court now, with my other hat, has to jump through some hoops. What I'm listening for is, did they jump through the hoops? And can we, enough that we can look past the language that Judge Fernandez read twice in the opinion? Yes, Your Honor. The court did jump through the hoops. The court discussed the conflict of interest beginning at page 30 of the record, and discussed it for many pages, discussed each one of these arguments, engaged in a weighing process, and reached a conclusion. And the quotation from Jordan is merely one of a number of different things that the court said. And I don't believe, and I believe that the court only stated it after the court has engaged in the weighing and decided what level of skepticism should be afforded Aetna's decision. So you say that was just sort of an unfortunate reference. Perhaps district courts should be more careful about citing Jordan and saying, well, we're doing it on a reasonable basis. But it's just sort of a stray comment, and really the district court did it right, correct? Yes, Your Honor. The court even explained its reasoning even more. It didn't just say, well, I find any reasonable basis, therefore. The court explained that Aetna reasonably relied on the opinions of both its reviewing physicians and plaintiff's own doctors, communicated fully with the plaintiff, and reasonably construed the terms of the plan. The court went over each one of the body factors and discussed them in its opinion. The court did not state that there is any reasonable basis, therefore I have to make this determination. The court used it as this wasn't arbitrary and capricious. This wasn't an arbitrary and capricious decision by Aetna. There was a reasonable basis for it, and here is the reasonable basis. The court applied all of the factors that were stated in the by this court in Abadi and even by the court in Glenn, even though the Glenn decision hadn't come down. The court considered every single factor. There was no clear error here. There's nothing that wasn't presented to the court, the district court at that time. All of the same arguments were made. Let me ask you another question. It's along the lines of what I asked here for the opponent. You know, this whole hinges in a sense, Aetna's decision hinges in a sense on that, I'll call it older, on that older neurologic examination. Aetna never really comes out and says, you know what? They say, well, we send a voicemail, and let's assume that's true, and we ask for objective evidence. Dr. Weiner sends in something that says, well, my objective evidence is she can't do serial sevens the way she ought to be, and a person of her quality operating at full cognition could do them faster. We can disagree about that, but the point is that's what he said. That's an objective test. Serial sevens are essentially an objective kind of test, at least we're always told that in the Social Security and in this area. So he did send some objective information. They never said, listen, what we really want, we're going to rely on that neurological, why don't you give us a new neurological? That would have been an easy thing for them to say if they were being kind of open and not being adversaries. Look, give us a new neurological. That's going to decide this case. They didn't, did they? They didn't, Your Honor. But Aetna didn't have to do that either. But Aetna did numerous times describe to Ms. Levitnick exactly what evidence that she should be providing. And there isn't an issue of whether the evidence wasn't provided that was somehow out there. It's just that the evidence provided was not sufficient. As Your Honor has pointed out earlier in the appellant's argument, the plaintiff was complaining about cognitive deficiency from way before she was even on disability. And in response to that complaint, Dr. Wehner sent her to the neurological test, which didn't comport with her self-reports of cognitive dysfunction. And she continued to complain about cognitive dysfunction. But in October of 2005, at the very end of October, I think it's October 31, 2005, when Dr. Wehner tests her again, the mental status examination shows she's oriented as to time and place, and that she could do her serial sevens. She didn't do them as fast as he might have expected, but she did do them. And there wasn't any evidence from Dr. Wehner that he wanted to go send her back for neurological testing. We had, Aetna had two reviewers, one in connection with the denial, and then two with connection with the appeal, evaluate these. And they were thorough evaluations. They were not just put aside. There was no, everything was considered, the plaintiff's physical demand analysis, the plaintiff's own appeal letter, the medical records, everything. Nothing was discounted. Judge Gutierrez followed the dictates of this court and the United States Supreme Court in assessing the conflict of interest evidence. And he reached a conclusion, and there was no clear error in connection with his decision. He considered all of the arguments offered by the appellant, and considered all of the evidence. He applied a temper deference in reaching his decision that Aetna's conclusion was correct. It would be a disservice to all district courts if after such a careful, detailed analysis and weighing, that that would be insufficient.  I like that last argument really well. I'm sorry, what? I like that last argument really well. Thank you, Your Honor. Does Your Honor have any other questions? I just want to conclude. Well, you know, Abatey, for all that it says and what we attempted to do in Abatey, I suspect it's not an easy case for the district court judges to actually follow, because what is temper deference, what is skepticism, what is counsel, what was it, healthy degree, whatever standard she used, it's difficult for the district court judges. And there is a temptation here. Judge Gutierrez did resort to the any rational basis test. Makes reference to it. Your Honor, I agree he makes reference to it. I do not believe that he resorted to it. And he even explained it a little bit further in his ruling on the motion for a new trial. Okay. Thank you. There is no question that the trial court did use the any reasonable basis test. We did make a motion for a new trial on this basis, that Jordan on this point had been overruled. And in response to that motion, the defendants opposed the motion, and they also stated that Jordan on this point was still good law. And that is what the trial court ruled on the motion for a new trial. There was no question that that is what the trial court's ruling was based upon. I'd also like to address Aetna's contention that its medical reviewers conducted a thorough evaluation and considered all of the evidence. One point that I did not make in my primary argument is regarding Dr. Anfield's review. He was another medical reviewer. And Dr. Anfield, originally in the beginning of his report, he criticized Dr. Weiner's findings because they weren't based on a mental status examination or other testing. However, when he reviewed the October 2005 office note, which was based on serial 7 testing, he dismissed that finding. He overtly dismissed that finding because the validity of the test results was not observed. And if that is going to be the criteria by which they are going to accept evidence, then they should have retained Dr. Anfield to personally examine plaintiffs and not just dismiss his findings. And I'd also like to point out, just to address the Court's comment, that Abatey is not an easy case to follow. I do a lot of this work in the trial courts, and perhaps one of the frustrations is that the prior test was a bright-line test. That's correct. And now what Abatey and MetLife v. Glenn have instructed the trial courts to do is to judge and to weigh the evidence. And district courts are perfectly capable of doing this. They can do this. This is what they do all the time. That's what we said in Abatey. They do this all the time. So I think that, yes, in this case, with the conflict evidence that we demonstrated, the Court should have decreased its difference. It should have considered the evidence outside of the record that we submitted regarding the credibility of their medical reviewers, and we request that the Court reverse and remand the case. Okay. Thank you. Case is submitted. Let's see. Our next case for argument this morning is United States v. Eduardo Martinez Valdez. Thank you for joining us.
judges: Fernandez, Paez, Hogan